1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| JESSE VARGISON and Rachael Forbis, individually and on behalf of themselves and all others similarly situated, | Case No. |
| Plaintiffs, | **COMPLAINT—CLASS ACTION** |
| v. | **JURY DEMAND** |
| PAULA'S CHOICE, LLC, | |
| Defendant. | |

CLASS ACTION COMPLAINT



# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................... 1

II.     PARTIES .................................................................................................................... 2

III.    JURISDICTION AND VENUE ................................................................................ 2

IV.     FACTS ....................................................................................................................... 4

        A.      History of Paula's Choice ............................................................................. 4

        B.      Paula's Choice's "Cruelty-free" Promise .................................................... 4

        C.      Animal Testing in the Cosmetic Industry .................................................. 15

        D.      Consumers' Attitudes Toward Animal Testing .......................................... 17

        E.      Regulations on Animal Testing for Cosmetics in the U.S. and
                Globally ...................................................................................................... 17

        F.      Beauty Industry in China ............................................................................ 20

        G.      Paula's Choice and the Chinese Market ..................................................... 27

        H.      Plaintiffs ...................................................................................................... 37

        I.      Terms of Use ............................................................................................... 42

V.      CLASS ACTION ALLEGATIONS ......................................................................... 43

VI.     COUNTS .................................................................................................................. 45

        COUNT I   BREACH OF EXPRESS WARRANTY UNDER THE
                UNIFORM COMMERCIAL CODE ............................................................ 45

        COUNT II   BREACH OF IMPLIED WARRANTY UNDER THE
                UNIFORM COMMERCIAL CODE ............................................................ 46

        COUNT III   VIOLATION OF THE MAGNUSON-MOSS WARRANTY
                ACT  15 U.S.C. § 2301, *ET SEQ.* ........................................................... 47

        COUNT IV   VIOLATION OF THE WASHINGTON CONSUMER
                PROTECTION ACT ("CPA") WASH. REV. CODE § 19.86, *ET
                SEQ.* ........................................................................................................... 48

PRAYER FOR RELIEF ....................................................................................................... 49

DEMAND FOR JURY TRIAL ............................................................................................ 50

## I.    INTRODUCTION

1.    Consumers should be able to trust a company's promises and statements about its products, and companies must keep their promise of cruelty-free products, ensuring that their team performs no animal testing. If companies do not keep their promise, the law holds companies accountable by recognizing that a company's promises and statements are part of the contract between the parties, and consumers deserve protection if the product fails to meet the promises on the label.

2.    Defendant Paula's Choice, LLC ("Paula's Choice") was founded on the principle that "Beauty Begins with Truth." One of the "truths" that Paula's Choice tells its customers is that it is "cruelty-free, always." Since 1995, Paula's Choice has publicized and reinforced this sentiment with its customers, always expressly emphasizing that its skincare products were never tested on animals and Paula's Choice never performs animal testing anywhere in the world.

3.    Paula's Choice's promise that its products were never tested on animals can be found on its products themselves, as well as in all its other media, publicity, and public relations materials, including advertisements, websites, marketing campaigns, and interviews. Over the years, Paula's Choice's product labels promise that its skincare products are 100% cruelty-free. Those promises include: "Never Animal Tested," and carry the Leaping Bunny certification logo, which tells consumers the company and product are cruelty-free.

4.    Yet, despite claiming Paula's Choice was always cruelty-free and repeating that promise for over 28 years, Paula's Choice prioritized its profits over its principles. Paula's Choice has not honored its promises, allowing animal testing on numerous products just to gain access to one of the world's biggest consumer marketplaces, China.

5.    Paula's Choice claimed it was always cruelty-free and through its Leaping Bunny certification, that it did not conduct animal tests anywhere in the world. While portraying itself in the United States as always being cruelty-free, Paula's Choice opted to import and sell its products in China where testing on animals was mandatory for companies like Paula's Choice during the class period. *See infra.*

6.      When a company agrees to perform animal testing to gain access to the Chinese market—while claiming the opposite in advertising, to the public, and on every product that it sells—consumers who purchased products with false representations about the characteristics of the products are harmed.

7.       Because the marketplace disdains cosmetic products affiliated with animal testing, the members of the Class were damaged at the point of sale by overpaying for cosmetics that were in fact actually tested on animals despite assurances on the product and its packaging stating otherwise.

8.      Consequently, Plaintiffs bring this as a class action on behalf of purchasers of any Paula's Choice skincare products. Plaintiffs claim on behalf of the Class that this conduct breached the express warranties given to Plaintiffs and the Class; violated the implied warranties of merchantability given to Plaintiffs and the Class, violated the Magnuson-Moss Warranty Act, and violated the Washington Consumer Protection Act.

## II.      PARTIES

9.      Plaintiff Jesse Vargison is a resident of Seattle, Washington who purchased Paula's Choice products.

10.      Plaintiff Rachael Forbis is a resident of Renton, Washington who purchased Paula's Choice products.

11.      Paula's Choice, Inc. was registered on November 30, 1994 as a Washington corporation. Thinking Forward Concepts, LLC was registered on November 15, 2012, as a Washington limited liability company. On November 16, 2012, Paula's Choice, Inc. merged with and into Think Forward Concepts, LLC, and the amended name of the limited liability company became Paula's Choice, LLC. Paula's Choice, LLC's current principal place of business is 700 Sylvan Ave, Englewood Cliffs, NJ 07632-3113. Through at least May 16, 2022, Paula's Choice, LLC's principal place of business was 705 5th Ave. S, Suite 200, Seattle, WA, 98104-4425.

## III.      JURISDICTION AND VENUE

12.      This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) because at least one class member is of diverse citizenship from Defendant, there are

1    over 100 class members, and upon information and belief, the aggregate amount in controversy

2    exceeds $5,000,000.

3        13.    This Court has personal jurisdiction over Plaintiffs because they are residents of this

4    District, or they submit to this Court's jurisdiction.

5        14.    This Court has personal jurisdiction over Defendant Paula's Choice because it is a

6    Washington limited liability company, has conducted and continues to conduct business in

7    Washington.

8        15.    Venue is proper in this District under 28 U.S.C. § 1391 because the events that gave

9    rise to the claims occurred in substantial part in this District, and Paula's Choice has a choice of

10   venue provision in its Terms of Use selecting King County, Washington.

11       16.    Upon information and belief, before November 2022, Paula's Choice maintained

12   headquarters in the State of Washington.

13       17.    Upon information and belief, Paula's Choice developed, determined, and

14   disseminated its cruelty-free claims at and from its headquarters in Washington.

15       18.    Upon information and belief, all marketing and advertising decisions related to

16   Paula's Choice's cruelty-free claims were made and disseminated from its headquarters in

17   Washington.

18       19.    Upon information and belief, Paula's Choice developed and determined the cruelty-

19   free labels, promises, representations, and logos placed on all its bottles and packaging from its

20   headquarters in Washington.

21       20.    Upon information and belief, all decisions related to Paula's Choice's cruelty-free

22   claims were made at and disseminated from its headquarters in Washington, including its decision

23   to sell products in China, which required animal testing, while simultaneously telling its consumers

24   it was not performing animal testing anywhere in the world.

25

26

27

28

CLASS ACTION COMPLAINT
Case No.                                    - 3 -

# IV.     FACTS

**A.      History of Paula's Choice**

21.     Paula's Choice is a manufacturer of professional skincare products, founded by Paula Begoun ("Begoun").

22.     Begoun began working in the beauty industry in the 1970s, working as a makeup artist, esthetician, and opening her own cosmetics store.

23.     In 1985, Begoun published her first book, *Blue Eyeshadow Should be Illegal*, which gained Begoun national attention and multiple appearances on the Oprah Winfrey Show.

24.     Begoun also began writing a syndicated column where she provided advice on beauty products.

25.     In 1992, Begoun wrote *Don't Go to the Cosmetics Counter Without Me*.

26.     At the same time, Begoun began working with a team of cosmetic chemists to develop her own skincare products.

27.     In 1994, Paula Begoun founded Paula's Choice, Inc. in Washington, which later became Paula's Choice, LLC.

28.     In 1995, Paula's Choice began selling skincare products exclusively online.

29.     Begoun acted as the face of Paula's Choice, being featured in the advertising for the company.

30.     Paula's Choice is currently only sold at PaulasChoice.com or at authorized retailers, which include Sephora (online or in-store), Amazon.com, and Dermstore.com.

31.     It is estimated that Paula's Choice has annual revenues of over $300 million per year.

**B.      Paula's Choice's "Cruelty-free" Promise**

32.     Since its formation, a key component of Paula's Choice's brand was that Paula's Choice's products were cruelty-free or never tested on animals.

33.     "Cruelty-free" is a term used in the skin care industry that means products and the ingredients in those products are not tested on animals.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

34.     Throughout its history, Paula's Choice maintained that it was a cruelty-free company and that its products were never animal tested, including these commitments on its products and packaging, on its website, and in its advertising.

35.     Paula's Choice includes its representations and promises about being cruelty-free on its products, product labels, and packaging.

36.     Paula's Choice products state on the bottles and packaging that they are "NEVER ANIMAL TESTED."

37.     Since at least 2013, Paula's Choice products also show that they are Leaping Bunny Certified, displaying the following symbol on the bottle:



38.     To become Leaping Bunny Certified a company must promise that it does not and will not conduct any animal testing, including on the formulations and ingredients in those products, anywhere in the world.[1]

39.     Leaping Bunny certification also requires the company to promise that it "shall not allow Animal Testing to be performed by or for submission to regulatory agencies in foreign countries."[2]

---

[1] The Corporate Standard of Compassion for Animals ("The Standard"), LEAPING BUNNY PROGRAM, https://www.leapingbunny.org/about/corporate-standard-compassion-animals-standard (last visited Mar. 12, 2024).

[2] *Id.*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1

40.     Some examples of those labels on the bottles and packaging include:

2

3

4

5

6

7

8

9

10

11

12

13

  

14

15

16

17

18

19

20

21

22

23

24

25

26

  

27

28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

   

16
17
18
19
20
21
22
23
24
25
26
27
28

41.     Paula's Choice bottles also state that the product was Manufactured in the USA for Paula's Choice, LLC.

42.     Upon information and belief, the decision to put Paula's Choice's cruelty-free claims on all its bottles and packaging was made from its headquarters in Washington.

43.     Over the years, Paula's Choice has represented in various ways on its website that it is a cruelty-free company that does not perform animal testing on its products.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

44.    In 2013, Paula's Choice represented on its website:[3]

No Animal Testing

Paula's Choice does not condone the use of animal testing on cosmetics and never has. Throughout Paula's 30 years of writing about the beauty industry she has consistently spoken out against testing cosmetics on animals. Paula's Choice, LLC. does not test our products on animals and never will. Additionally, we do not fund any independent source to conduct animal testing on our behalf. We are committed to the global adoption of alternative safety testing methods and the elimination of animal testing on cosmetics worldwide. In April 2013, Paula's Choice became an officially certified member of the **Leaping Bunny Program**.

The requirements for the Leaping Bunny Certification include a commitment to eliminate animal testing not only from the company, but also from our ingredient suppliers. The result is a product guaranteed to be 100% free of new animal testing. The program is administered by a coalition of animal rights organizations, including the Humane Society of the United States and the National Anti-Vivisection Society.

Last, but certainly not least, we support many animal-centered charities such as the Humane Society and the ASPCA. We are also a pet-friendly office, with many of our employees bringing their beloved dogs to work with them.

45.    Paula's Choice made the same commitment on its website in 2015 and 2016:[4]

NO ANIMAL TESTING

Animal testing is not okay with us. We're part of the Leaping Bunny Program, which means not only have we eliminated animal testing from our company, but also from our ingredient suppliers. We love animals so much that employees bring their dogs to work. Keeps things real.

46.    In 2014, Paula's Choice's website advertised "NO ANIMAL TESTING":[5]



---

[3] About Paula's Choice, PAULA'S CHOICE, https://web.archive.org/web/20130501172337/http://www.paulaschoice.com/who-we-are/about-paulas-choice/?= (last visited Mar. 12, 2024).

[4] Our Story, PAULA'S CHOICE, https://web.archive.org/web/20150621211049/http://www.paulaschoice.com/who-we-are/about-paulas-choice and https://web.archive.org/web/20160730004741/http://www.paulaschoice.com/who-we-are/about-paulas-choice/ (last visited Mar. 12, 2024).

[5] Who We Are, PAULA'S CHOICE, https://web.archive.org/web/20140628110642/http://www.paulaschoice.com/who-we-are/ (last visited Mar. 12, 2024).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

47.     Paula's Choice continued to advertise that it performed no animal testing in 2015 and 2016:[6]





⁶ Who We Are, PAULA'S CHOICE, https://web.archive.org/web/20150623020742/http://www.paulaschoice.com/who-we-are and https://web.archive.org/web/20160730010946/http://www.paulaschoice.com/who-we-are/ (last visited Mar. 12, 2024).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

48.     Paula's Choice's website in 2019–2022 advertised under its "BEAUTY BEGINS WITH TRUTH" banner that it was "cruelty-free":[7]

## You deserve smart skin care choices—minus all the hype.

Our philosophy? Smart, Safe Beauty. The products you use should work and be good for your skin, no exceptions. Based on our heritage in consumer advocacy, each of our formulas is effective, safe and backed by cited scientific research.

We uncover the truth about skin care and share all of the facts with you along the way—because keeping your skin healthy shouldn't be a mystery.

**+ SMART   + SAFE   + EFFECTIVE   + FRAGRANCE-FREE   + CRUELTY-FREE**

49.     In 2019–2022, Paula's Choice also represented on its website that it was "Cruelty-Free Always."[8]

### CRUELTY-FREE ALWAYS

We never test on animals at any stage of product development or testing & never will. We are proud to be Leaping Bunny-certified.

---

[7] About Us, PAULA'S CHOICE, https://web.archive.org/web/20191218102216/https://www.paulaschoice.com/who-we-are/about-us, https://web.archive.org/web/20200815010527/https://www.paulaschoice.com/who-we-are/about-us, https://web.archive.org/web/20211030202527/https://www.paulaschoice.com/who-we-are/about-us, and https://web.archive.org/web/202204 09210946/https://www.paulaschoice.com/who-we-are/about-us (last visited Mar. 12, 2024).

[8] About Us, PAULA'S CHOICE, https://web.archive.org/web/20191120232457/https://www.paulaschoice.com/who-we-are/about-us, https://web.archive.org/web/20200815010527/https://www.paulaschoice.com/who-we-are/about-us, https://web.archive.org/web/20211105165129/https://www.paulaschoice.com/who-we-are/about-us, https://web.archive.org/web/202204092 10946/https://www.paulaschoice.com/who-we-are/about-us (last visited Mar. 12, 2024).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

50.     Today, Paula's Choice continues to promote its cruelty-free stance.

51.     Paula's Choice currently represents on its website that it has never tested on animals:[9]

## ANIMAL TESTING AND BY-PRODUCTS

**Do you test on animals?**

No. Paula's Choice has never tested on animals at any stage of product development and never will. We also do not contract with any third parties to conduct animal testing on our behalf. We're part of the Leaping Bunny Program, which means not only have we eliminated animal testing from our company, but also from our ingredient suppliers.

Paula's Choice supports many charities focused on animal welfare such as the Humane Society, ASPCA and NAVS. Paula's Choice is a dog-friendly office, with most of our employees bringing their canine companions to work each day.

52.     Upon information and belief, Paula's Choice's claims about animal testing were developed and issued from its headquarters in Washington.

53.     Paula's Choice's official Instagram account promotes that it is cruelty-free.[10]



_____

[9] Animal Testing and By-Products, PAULA'S CHOICE, https://help.paulaschoice.com/hc/en-us/articles/360035072173-Animal-Testing-and-By-Products (last visited Mar. 12, 2024).

[10] Paula's Choice (@paulaschoice), INSTAGRAM,  https://www.instagram.com/paulaschoice/ (last visited Mar. 12, 2024).

1    54.    In a recent Instagram post, Paula's Choice reiterated that its products were not tested

2    on animals:



16    55.    That Instagram post included the following caption:[11]



───────────────

[11] Paula's Choice (@paulaschoice), INSTAGRAM (September 30, 2023), https://www.instagram.
com/p/Cx0cLeZNtV8/ (last visited Mar. 12, 2024).

CLASS ACTION COMPLAINT
Case No.                               - 12 -

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

56. In a similar post, Paula's Choice reiterated it was cruelty-free:



57. The post was captioned:



paulaschoice ✔ · Follow
Original audio

paulaschoice ✔ We're using #InternationalRabbitDay 🐰 (which is a very cute holiday, in our opinion) as an opportunity to remind you that we're cruelty-free, & always have been! We never test on animals at any stage of product development & we're Leaping Bunny-certified. 🐇
🤩 Special appearance by Waffles the bunny
·

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

58.     A similar post appeared on Paula's Choice's Facebook page.[12]



59.     Upon information and belief, the representations and content of Paula's Choice's website and social media pages were developed and issued from its headquarters in Washington.

60.     People for the Ethical Treatment of Animal's ("PETA") has a certification program called "Beauty Without Bunnies," which requires companies to sign a statement of assurance verifying it does not test on animals anywhere in the world.

61.     Paula's Choice appears on PETA's list of companies that does not test on animals anywhere in the world, including China.[13]

---

[12] Paula's Choice Post (@PaulasChoice.Inc), FACEBOOK (September 24, 2023), https://www. facebook.com/reel/853079449637680 (last visited Mar. 12, 2024).

[13] Paula's Choice (Unilever), PETA, https://crueltyfree.peta.org/company/paulas-choice/ (last visited Mar. 12, 2024).

62.     On April 1, 2021, Paula's Choice and Paula Begoun were featured as a cruelty-free, women-owned brand on PETA's website.[14]

## C.    Animal Testing in the Cosmetic Industry

63.     Animal testing has been used in the cosmetics industry in the past to ensure that products were safe for consumers to use.

64.     Testing performed on animals in the cosmetics industry include various toxicity and irritancy tests.

65.     Acute toxicity tests are used to determine the danger of exposure to a chemical by mouth, skin, or inhalation and is usually performed on mice or rats.[15]

66.     LD50, also known as Lethal Dose 50, is a type of acute toxicity test where animals are dosed with a test chemical to determine the dose at which half of the test animals die.[16]

67.     Fixed dose method is another type of acute toxicity test, but it does not use death at the endpoint. The testing will be stopped when the animal demonstrates signs of ailment or distress.[17]

68.     Other acute toxicity tests include the up-and-down procedure and acute toxic class methods. While these tests do not result in the death of the animal, the animals will often endure intense pain, convulsions, loss of motor function, and seizures.[18]

69.     The animals are killed when all the testing is complete so a necropsy can be performed to determine internal damage.[19]

---

[14] Rebecca Maness, *These Women are Leading the Charge for Cruelty-Free Products*, PETA, https://www.peta.org/living/personal-care-fashion/animal-test-free-women-owned-beauty-brands/ (last visited Mar. 12, 2024).

[15] Animals in Science, AMERICAN ANTI-VIVISECTION SOCIETY, https://aavs.org/animals-science/how-animals-are-used/testing/ (last visited Mar. 12, 2024); Earnest Oghenesuvwe Erhirhie, Chibueze Peter Ihekwereme, & Emmanuel Emeka Ilodigwe, *Advances in acute toxicity testing: strengths, weaknesses and regulatory acceptance*, Interdisciplinary Toxicology, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6117820/ (last visited Mar. 12, 2024).

[16] *Id.*

[17] *Id.*

[18] *Id.*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

70.     The Draize test is a test devised in 1944 by John H. Draize and Jacob M. Spines, toxicologists at the FDA, to assess how chemicals cause eye and skin irritation. The Draize test is generally performed on rabbits, particularly albino rabbits, although the testing can be performed on other animals as well.[20]

71.     During the testing a chemical is placed in the eye or on the skin of a conscious and restrained animal, left on for a set amount of time, rinsed off, and its effects then recorded.[21]

72.     The animals are then observed for up to fourteen days looking for signs of erythema and edema in the skin or redness, swelling, discharge, ulceration, hemorrhaging, cloudiness, or blindness in the tested eye.[22]

73.     The animals are killed after the testing if the test causes irreversible damage to the eye or skin. If the test does not cause permanent damage, the animas are typically used again once all traces of the tested product have dispersed from the testing site.[23]

74.     Skin sensitization tests are used to determine if a chemical causes an allergic reaction.

75.     One type of skin sensitization test is the Guinea Pig Maximization Test, where a chemical is injected into the guinea pig, along with a chemical adjuvant to boost the immune reaction. Multiple doses are given until the animal develops an allergic reaction.[24]

76.     Another skin sensitization test is the Buehler test, which is similar to the Guinea Pig Maximization Test, but no adjuvant is used to boost the immune reaction.[25]

---

[19] *Id.*

[20] Draize test, WIKIPEDIA, https://en.wikipedia.org/wiki/Draize_test (last visited Mar. 12, 2024).

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] Animals in Science, AMERICAN ANTI-VIVISECTION SOCIETY, https://aavs.org/animals-science/how-animals-are-used/testing/ (last visited Mar. 12, 2024).

[25] *Id.*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

77.     In both the Buehler test and the Guinea Pig Maximization test the animals are killed after testing.[26]

78.     A more recent and commonly used skin sensitization test is the Local Lymph Node Assay, where test chemicals are applied to the surface of the ears of mice. The mice are then killed and then their lymph node cells are removed and analyzed.[27]

**D.     Consumers' Attitudes Toward Animal Testing**

79.     Consumers around the world have called for the end of animal testing for cosmetics. Too many consumers are opposed to it.[28]

80.     Most U.S. consumers prefer cosmetic products that have not been tested on animals.

81.     In a recent poll from 2019, 79% of Americans support a federal law that would end animal testing on cosmetics.[29]

**E.     Regulations on Animal Testing for Cosmetics in the U.S. and Globally**

82.     The FDA has the authority to regulate cosmetics under the Federal Food, Drug, and Cosmetic Act ("FD&C Act"), related statutes, and regulations promulgated under the FD&C Act.[30]

83.     "The FD&C Act does not specifically require the use of animals in testing cosmetics for safety, nor does the Act subject cosmetics to FDA premarket approval."[31]

---

[26] *Id.*

[27] *Id.*; Local lymph node assay, WIKIPEDIA, https://en.wikipedia.org/wiki/Local_lymph_node _assay (last visited Mar. 12, 2024).

[28] Kerry Postlewhite, *'Brands can no longer ignore the 8.3 million people who want end to animal testing'*, REUTERS EVENTS, https://www.reutersevents.com/sustainability/brands-can-no-longer-ignore-83-million-people-who-want-end-animal-testing (last visited Mar. 12, 2024).

[29] New Poll Reveals US United Against Cosmetics Animal Tests, CRUELTY FREE INTERNATIONAL, https://crueltyfreeinternational.org/latest-news-and-updates/new-poll-reveals-us-united-against-cosmetics-animal-tests (last visited Mar. 12, 2024).

[30] Animal Testing & Cosmetics, U.S. FOOD & DRUG ADMINISTRATION, https://www.fda.gov/ cosmetics/product-testing-cosmetics/animal-testing-cosmetics (last visited Mar. 12, 2024).

[31] *Id.*

CLASS ACTION COMPLAINT
Case No.                                                    - 17 -


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

84.     The FDA goes beyond not requiring animal testing, also suggesting that "consideration should be given to the use of scientifically valid alternative methods to whole-animal testing."[32]

85.     Because the practice of animal testing is found to be objectionable and cruel by so many, several states and other countries have gone further and banned the practice.

86.     In 1988, the United Kingdom was the first country to ban animal testing on cosmetics.

87.     The European Union also banned animal testing on cosmetics in a phased approach that was completed in 2013.

88.     Other countries including Israel, India, Turkey, Brazil, New Zealand, and Norway also have bans on animal testing.

89.     Eleven states have passed laws that ban or limit the sale of cosmetic products tested on animals, including Virginia (Va. Code Ann. § 59.1-572), California (Cal. Civ. Code § 1834.9.2), Louisiana (La. Stat. Ann. § 51:772), New Jersey (N.J. Stat. Ann. § 4:22-59), Maine (Me. Rev. Stat. tit. 10, § 1500-M), Hawaii (Haw. Rev. Stat. Ann. § 321-30.4), Nevada (Nev. Rev. Stat. Ann. § 598.993), Illinois (410 Ill. Comp. Stat. Ann. 620/17.2), Maryland (Md. Code Ann., Health-Gen. § 21-259.30), New York (N.Y. Gen. Bus. Law § 399-AAAAA), and Oregon (Or. Rev. Stat. Ann. § 646A.009).

90.     The legislative history of some of these laws reveals public support for banning animal testing.

91.     Nev. Rev. Stat. Ann. § 598.993 prohibits the sale of cosmetics that have been tested on animals on or after January 1, 2020.

92.     The legislative history of Nev. Rev. Stat. Ann. § 598.993 shows that the motivations for the bill were, in part, to meet the demand of and protect consumers: "Consumers *overwhelmingly* are starting to reject products tested on animals. Statistically, businesses that have

---

[32] *Id.*


1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

eliminated their animal testing policies have been successful and profitable. On an anecdotal level, I can tell you that I have had dozens of people come to me since I introduced this bill and say, I only use products that are not tested on animals; I always check the label; and it is so hard to know if a product has been tested on animals." Nevada Assembly Committee Minutes, 5/15/2019 (emphasis added).

93.     Cal. Civ. Code § 1834.9.5, prohibits manufacturers from selling cosmetics in California if the cosmetic was tested on animals on or after January 1, 2020.

94.     The legislative history of Cal. Civ. Code § 1834.9.2 (S.B. 1249) shows that over 4,000 individuals contacted the legislature to voice support of the bill. California Bill Analysis, S.B. 1249 Sen., 8/28/2018. In contrast only four entities (and no individuals) voiced opposition to the bill. *Id.*

95.     The bill analysis also provided: "The bill has received an ***intense groundswell of support from concerned citizens, animal welfare groups, and many companies in the cosmetic industry*** that are strongly committed to a vision of a truly "cruelty-free standard" for cosmetic products sold in California. The bill is also supported by a coalition of approximately 80 cosmetic companies who attest that they are proof that a company can be profitable but also committed to manufacturing products without any reliance on animal testing whatsoever." California Bill Analysis, S.B. 1249 Assem., 6/26/2018 (emphasis added).

96.     That analysis further noted: "The Committee has received over 6,500 letters in support of the bill from individuals providing a California address, and has taken note of an online petition signed by more than 150,000 persons from around the world, voicing support for this bill." California Bill Analysis, S.B. 1249 Assem., 6/26/2018.



**F.      Beauty Industry in China**

97.      According to one industry report, as of 2020, the Chinese cosmetics market is the second largest in the world after the United States, which includes hair care, skin care, and other toiletries.[33]

98.      China has an increasing demand for "higher quality, premium brand products."[34]

99.      More than half of Chinese cosmetics consumers prefer foreign brands over local ones.[35]

100.      The market size of cosmetics in China was more than 455 billion yuan in 2021, equivalent to over $63 billion USD at the current exchange rate.[36]

101.      According to the United States Department of Commerce in 2016, China is the 10th largest market for U.S. personal care and cosmetics exports" and "China is expected to become the largest market for personal care and cosmetics products globally in the next five to ten years." Excerpts from the Asia Personal Care & Cosmetics Market Guide, 2016, United States Department of Commerce, International Trade Administration, Exhibit 1 at 10.

102.      Until 2021 it was mandatory for foreign manufacturers and distributors who wanted to sell products in China to obtain a specific approval issued by the National Medical Products Administration ("NMPA") (formerly the China Food and Drug Administration ("CFDA")).

103.      Skincare products, such as moisturizers, cleansers, and toners, are classified under Chinese law as ordinary or "non-special use cosmetics."

104.      Skincare products containing sunscreen are classified under Chinese law as "special use" cosmetics.

---

[33] Cosmetics market size in China from 2015 to 2023 with forecasts until 2025, STATISTA, https://www.statista.com/statistics/875794/china-cosmetics-market-size/ (last visited Mar. 12, 2024).

[34] *Id.*

[35] *Id.*

[36] *Id.*; Chinese Yuan to United States Dollar, GOOGLE FINANCE, https://www.google.com/finance/quote/CNY-USD?hl=en (last visited Mar. 12, 2024).



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    105.    Starting in 1990, the NMPA required all imported special and non-special use

2    cosmetics to be tested on animals in Chinese designated and certified laboratories before they could

3    be approved for importation and distribution in the Chinese market.

4    106.    From 1990 to the present, all foreign-produced special use cosmetics need to be

5    registered with and approved by the NMPA before they could be imported and sold in China.

6    107.    From 1990 to November 7, 2018, all foreign-produced non-special use cosmetics

7    needed to be registered with and approved by the NMPA before they could be imported and sold in

8    China.

9    108.    After November 7, 2018, non-special use cosmetics only require a premarket

10   registration and can be imported after registration has been completed. That premarket registration

11   requires the same animal testing as the earlier registrations but changes the timing for when a

12   product can be imported into China.

13   109.    To receive NMPA registration on foreign-produced special or non-special use

14   cosmetics, a company must appoint and register a domestic responsible agent in China.

15   110.    The domestic responsible agent must file an application with the NMPA on behalf

16   of the company that includes an examination and testing report issued by an NMPA-designated

17   examination and testing institution.

18   111.    All NMPA-designated testing institutions are in China.

19   112.    This means the domestic responsible agent must hire a laboratory in China to

20   perform the required testing. These laboratories are designated and certified by the Chinese

21   government.

22   113.    The examination and testing report is governed by Chinese specific regulations,

23   with standards issued in 2002, updated in 2007, and updated again in 2015.

24   114.    From 2007 to 2014, China's Hygienic Standards for Cosmetics (2007) dictated the

25   required examination and testing report. A translation of those standards is attached as Exhibit 2.

26   115.    Those standards provide that the examination and testing report include multiple

27   skin irritation tests for cosmetics used daily, acute skin irritation tests for cosmetics rinsed after

28   use, and acute eye irritation tests for products that may come into contact with eyes.

CLASS ACTION COMPLAINT
Case No.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1      116.    The specifications for those tests are described in detail in the Hygienic Standards

2  for Cosmetics.

3      117.    The acute skin irritation test includes applying the test substance to the shaved skin

4  of the animal, leaving the product on for 2 hours or longer, and then observing skin reactions at 1,

5  24, 48, and 72 hours after the product is removed. Ex. 2, Part II at 107.

6      118.    The multiple skin irritation test includes the same procedure as the acute skin

7  irritation test, but the product is applied to the animal every day for 14 days, shaving the animal's

8  skin before each application. Ex. 2, Part II at 107.

9      119.    The 2007 Standards note regarding the skin irritation tests: "Animals should be

10  humanely executed if they show signs of severe depression and distress at any stage of the test."

11  Ex. 2, Part II at 105.

12      120.    The acute eye irritation test involves applying the test substance in the conjunctival

13  sac of one eye of the animal and not rinsed for at least 24 hours, but the substance is only rinsed if

14  deemed necessary. The eyes are examined at 1, 24, 48, and 72 hours after the substance is applied.

15  If no irritation is found, the test is terminated. If irritation is found, the test continues, and the eyes

16  of the animals are examined again at 4 and 7 days. Ex. 2, Part II at 113–14.

17      121.    The 2007 Standards note regarding the acute eye irrigation test: "Animals that show

18  signs of severe depression and distress at any stage of the test should be humanely put to death and

19  the subject evaluated appropriately in the light of the test. Animals that show corneal perforation,

20  corneal ulceration, corneal 4 points for more than 48h, lack of light reflex for more than 72h,

21  conjunctival ulceration, gangrene and decay, which are usually signs of irreversible damage,

22  should also be humanely executed."  Ex. 2, Part II at 111.

23      122.    Since 2015, the examination and testing report is governed by the Safety and

24  Technical Standards for Cosmetics (2015). A translation of those standards is attached as Exhibit 3.

25      123.    Those standards provide that the examination and testing report must include the

26  acute dermal irritation test and the acute eye irritation test.

27      124.    The specifications for those tests are similar to the 2007 tests and are described in

28  detail in the Safety and Technical Standards for Cosmetics, but they include placing the product to

**HAGENS BERMAN**

be tested in the eye of the animal or on the shaved skin of the animal, leaving that product in the eye or on the skin, and observing its effects at 1, 24, 48, and 72 hours after application. Ex. 3 at 20–35.

125.    Those regulations also provide: "If animals show severe depression and pain at any stage of the trial, they should be executed humanely."  Ex. 3 at 22, 28.

126.    If a product is deemed special use because it contains UV protection, a skin phototoxicity test must be performed, which requires shaving off four patches of hair from a white rabbit or albino guinea pig, as shown in the following diagram (Ex. 2. Part II at 125):



Figure 1 Schematic diagram of the location of the skin debridement area of the animal

127.    The UV product is then applied to patches 1 and 2, with patches 3 and 4 left bare. Aluminum foil is then taped to the animal to cover patches 1 and 3, while patches 2 and 4 are irradiated with UV light. Ex. 2, Part II at 123–26.

128.    The animal's skin reactions are then observed and scored at 1 hour, 24 hours, 48 hours, and 72 hours after UV exposure. *Id.*, Part II at 125.

129.    This test is identical in the 2007 and 2015 Standards. Ex. 3 at 44–49.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

130.   The process to import products into China is also described by the United States Department of Commerce in its "Asia Personal Care & Cosmetics Market Guide, 2016" (Ex. 1 at 16), which states:

> Cosmetics in China are categorized as ordinary and special use cosmetics. Perfume, skin care, shampoo and color cosmetics fall into ordinary products and special use products refer to hair dye, hair perm, hair-growing, sunblock, anti-spot, slimming, breast-beautifying, depilatories and deodorant etc.
>
> According to the CFDA (China Food and Drug Administration), all foreign cosmetic product manufacturers must complete a safety and health quality test, and obtain a hygiene permit before they are allowed to sell in the Chinese market. Application for this pre-market approval process can only be carried out by a Chinese legal entity. Overseas cosmetics manufacturers without legal representation in China are thus required to apply for the permit through agent services. The Manufacture [sic] needs to sign a "Letter of Authorization" confirming that it authorizes a Chinese company to be the registration responsible party in mainland China for the products.

131.   The Department of Commerce also describes the required testing and the application procedures (*Id.* at 16–18):

> **Safety and Health Quality Test**
> This test is performed by designated laboratories appointed by the CFDA and are listed on the CFDA website. All these labs have different testing capabilities designated for testing against specific conditions, such as microbiology, hygienic chemistry, toxicology test (which includes animal testing) or conducting safe-for–human-use trials (for special use cosmetics). The test normally takes 2-3 months for ordinary cosmetics and 3-8 months for special-use cosmetics, while costs vary from $700 to $6,000 depending on the types and complexity of the products.
> . . .
> **Hygiene Permit for Imported Cosmetics**
> Once testing is completed, the designated laboratory will issue a test report which needs to be submitted together with the other required documents for the application of the Hygiene Permit from CFDA. A committee under CFDA convenes to technical review and evaluate of [sic] imported cosmetics. The technical review time will be 3 months generally. If one application has been approved, a certificate will be issued by the CFDA. Companies

need to submit the following documents (all translated in Chinese and notarized by a Chinese notarization company):

Application form for the cosmetic product to be imported
- Chinese product name and nomenclature;
- Product formula;
- Product quality and safety control file (The product info such as appearance, flavor, batch no and shelf life is required. Other quality control index like heavy metals and microbiology should be provided as well);
- Original product packaging including labelling information and product information sheet;
- Testing report and relevant data from testing organization certified by CFDA;
- Safety assessment report of cosmetics containing potential risk substances;
- Stamped copies of power of attorney and business license of Chinese responsible agent;
- Statement from manufacturer guaranteeing that materials used meet the requirements of BSE free regions.
- Free Sale Certificate at production country (region) or country (region) of origin
- Brief description and diagram of production process
- Technical requirements for cosmetic products in text
- Other relevant information which can support the application

The applicant will be notified by the CFDA within 5 days confirming whether the application is accepted or not. If the application is not accepted, the CFDA will provide explanation of discrepancies or missing documentation allowing the application to be resubmitted.

The Hygiene Certificate is valid for 4 years, and foreign manufacturers are required to renew it at least 4 months before it is expired.

132.    Foreign-produced cosmetics also must be imported through China in accordance with its customs regulations.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

133.    Through 2021, a company would have had to provide a copy of the NMPA registration when going through customs, along with other information required under Chinese law.[37]

134.    An imported cosmetic must include a product label, which must list the manufacturer, the domestic responsible agent, and the NMPA registration number.

135.    Up until 2018, a registration for non-special use cosmetics with the NMPA lasted four years, meaning that every foreign-produced cosmetic sold in China would have to be registered every four years and undergo animal testing every four years.

136.    After 2018, non-special use product registrations do not expire, but starting on January 1, 2022, the registrant must provide an annual report to the NMPA. If an annual report is not filed, the NMPA may cancel the registration.

137.    Registrations for special-use cosmetics only last for four years, meaning that every foreign-produced special use cosmetic sold in China would have to be registered every four years and undergo animal testing every four years.

138.    In addition to the pre-market animal testing, all foreign-produced special and non-special use cosmetics can be subjected to post-market safety testing by Chinese authorities. This post-market testing includes animal testing.

139.    On February 26, 2021, the NMPA promulgated the Administrative Provision for Cosmetics Registration and Filing Documents ("2021 Provision"), which allows foreign manufacturers of non-special use cosmetics to receive an exemption from animal testing. Starting on May 1, 2021, as a guarantee of safety, the NMPA can accept a specified certification and product safety assessment from the country of manufacture, instead of requiring animal testing.

---

[37] These requirements are found in the Measures for the Supervision and Administration of Inspection and Quarantine of Imported and Exported Cosmetics (formerly General Administration of Quality Supervision, Inspection and Quarantine of the People's Republic of China) (Order No. 143, revised according to Orders No. 238, No. 240, and No. 243 of the General Administration of Customs), the Announcement from General Administration of Customs (Announcement No. 99 of 2020), and Announcement on Adjusting the Supervision Requirements for Some Imported and Exported Goods (Announcement No. 99 of 2020).



1   140.    This exemption does not apply to special use cosmetics.

2   141.    Since the 2021 Provision came into effect, several foreign manufacturers, including

3   at least one based in California, have been granted approvals without requiring animal testing.

4   142.    Since 2014, a cosmetic company can also get an exemption from animal testing by

5   setting up or using domestic manufacturing facilities in China.

6   143.    This exemption does not apply to special use cosmetics.

7   144.    Domestic manufacturers of non-special use cosmetics can receive an exemption

8   from animal testing, although they can still be subject to post-market testing by Chinese authorities.

9   This post-market testing includes animal testing.

10  **G.    Paula's Choice and the Chinese Market**

11  145.    Paula's Choice began selling skincare products in China in 2009.

12  146.    Paula's Choice registered at least sixty products, including one special use cosmetic

13  with sunscreen, with the NMPA in China from 2009 to 2020. A list of Paula's Choice's NMPA

14  registrations is attached as Exhibit 4.

15  147.    Each of those product registrations would have required a testing report, meaning

16  that Paula's Choice selected and retained a Chinese laboratory to perform animal testing.

17  148.    The NMPA maintains a database, listing each of the registrations.

18  149.    Each product received an NMPA registration number, meaning Paula's Choice's

19  domestic responsible agents submitted an application for each product that included the

20  examination and testing report as outlined in the Hygienic Standards for Cosmetics (2007) and

21  Safety and Technical Standards for Cosmetics (2015).

22  150.    Each examination and testing report required Paula's Choice's products (all 60 of

23  them) to be tested on animals by the respective Chinese lab selected during the registration process.

24  151.    Each product also lists Paula's Choice or its agent as the manufacturer of the

25  product.

26  152.    Paula's Choice also had to provide a copy of the NMPA registration or application

27  when going through customs, along with other information required under Chinese law. *See supra*.

28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

153.     Paula's Choice could not have imported foreign cosmetics into China, or gone through Chinese customs, without an NMPA registration, each of which would require retaining a certified laboratory to do animal testing for that product.

154.     At least by 2009, Paula's Choice engaged Shanghai Yingwen Economic and Trade Co., Ltd. ("Shanghai Yingwen") as its distributor in China.

155.     Shanghai Yingwen was established by Ying Yang ("Yang") on August 18, 2006.

156.     Shanghai Yingwen is wholly owned by Yang.

157.     Shanghai Yingwen continued to act as Paula's Choice's domestic responsible agent in China through 2020.

158.     Each of the sixty of Paula's Choice's NMPA registrations from 2009 to 2020 lists Shanghai Yingwen as the registered agent. Paula's Choice's NMPA registrations, Ex. 4.

159.     Shanghai Yingwen established and maintained the Paula's Choice China website www.paulaschoice.com.cn.

160.     While the Paula's Choice China website is no longer active, it was active and selling products in China from at least December 19, 2009,[38] to March 22, 2012.[39]

161.     In addition to selling products on the Paula's Choice China website, Paula's Choice sold in China through Amazon China, Paula's Choice Tmall site, and Little Red Book.

162.     In 2010, Paula Begoun travelled to China to promote Paula's Choice's entry into China.

163.     In 2010, Paula's Choice posted on its Facebook page: "Looks like I'll be going to China in September for media interviews. Paula's Choice is available in China at www.PaulasChoice.com.cn. –Paula."[40]

---

[38] Homepage, PAULA'S CHOICE CHINA, https://web.archive.org/web/20091219102503/http://www.paulaschoice.com.cn/ (last visited Mar. 12, 2024).

[39] Homepage, PAULA'S CHOICE CHINA, https://web.archive.org/web/20120322162205/http://www.paulaschoice.com.cn:80/ (last visited Mar. 12, 2024).

[40] Paula's Choice Post, FACEBOOK (June 8, 2010), https://www.facebook.com/PaulasChoice.Inc/posts/looks-like-ill-be-going-to-china-in-september-for-media-interviews-paulas-choice/117169221660237/ (last visited Mar. 12, 2024).



164.    On August 10, 2010, Paula's Choice posted on its Facebook page that Begoun would be visiting Paula's Choice's distributor in China:



165.    Upon information and belief, that post has since been removed from the Paula's Choice Facebook page.

166.    On September 20, 2010, Paula's Choice's Facebook page posted that Begoun was visiting with its global distributors, attaching photos from her trip to China:[41]

---

[41] The post itself is visible on Paula's Choice's Facebook page, but the URL could not be accessed, as clicking on it results in a message which states: "**Error** We can't access this post, it may have been deleted."



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15    167.    In one photo, Begoun is photographed with Yang, with the caption: "Celebrating

16  Paula's Choice in China.[42]

17



18
19
20
21
22
23
24
25

26    [42] Paula's Choice's Post, FACEBOOK (September 20, 2010), https://www.facebook.com/photo?
fbid=439433579003&set=ms.c.eJwzMbY0MTY2MTMxMDDWMwFzTM0tkTgWyDIWSDJmy
27  MrMwMoAXfsPhw~-~-.bps.a.405023569003 (last visited Mar. 12, 2024).
28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

168.    Begoun was also photographed with the CFO of Taobao, Daniel Zhang:[43]



169.    Taobao owns Tmall (formerly Taobao Mall), the leading local Chinese E-commerce platform where Paula's Choice products are sold.

170.    From 2009 to 2011, Paula's Choice registered five products with the NMPA, each product requiring animal testing. Paula's Choice's NMPA registrations, Ex. 4.

171.    In 2012, PETA began exposing multiple cosmetic companies that claimed to be cruelty-free but had been selling products in China and undergoing animal testing.[44]

172.    PETA also began removing those companies from its Beauties Without Bunnies certification program if they did not stop selling in China.[45]

173.    In 2012, Paula's Choice shut down its Chinese website and instead directed consumers to its Hong Kong website.

---

[43] Paula's Choice's Post, FACEBOOK (September 20, 2010),  https://www.facebook.com/photo?fbid=439433464003&set=ms.c.eJwzMbY0MTY2MTMxMDDWMwFzTM0tkTgWyDIWSDJmyMrMwMoAXfsPhw~-~-.bps.a.405023569003 (last visited Mar. 12, 2024).

[44] *See* Michelle Reynolds, *Avon, Mary Kay, Estée Lauder Resume Animal Tests*, Feb. 16, 2012, PETA, https://www.peta.org/blog/3-companies-booted-cruelty-free-list/ (last visited Mar. 12, 2024).

[45] *Id.*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1

174.    The Hong Kong website remained nearly identical to the Chinese website.[46]





175.    Upon information and belief, Paula's Choice removed its Chinese website to make it appear that it was no longer doing business in China and only doing business in Hong Kong.

176.    On February 20, 2013, PETA reported that Paula's Choice was one of the companies that was no longer going to sell in China.[47]

177.    Paula's Choice did not stop selling in China in 2012 or 2013.

---

[46] Homepage, PAULA'S CHOICE CHINA, https://web.archive.org/web/20120127102512/http://paulaschoice.com.cn/; Homepage, PAULA'S CHOICE HONG KONG, https://web.archive.org/web/20120430212330/http://www.paulaschoice.hk:80/ (last visited Mar. 12, 2024).

[47] Michelle Reynolds, *Pangea Organics Stops Selling in China to Save Animals*, PETA (February 20, 2013), ("And NYX, Paula's Choice, Yes To Carrots, and Jack Black have all said, "No, thanks!" to the Chinese market until tests on animals are no longer required—and that day is coming closer."), https://www.peta.org/blog/pangea-organics-stops-selling-china/ (last visited Mar. 12, 2024).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

178.     In 2012 Paula's Choice registered twelve products with the NMPA in China, each requiring animal testing. Paula's Choice's NMPA registrations, Ex. 4.

179.     In 2013, Paula's Choice registered six products with the NMPA in China, each requiring animal testing, and all of them were registered after PETA reported that Paula's Choice was not selling in China. *Id.*

180.     If Paula's Choice was only selling in Hong Kong, it would not have needed to obtain the NMPA registrations in China in 2012 and 2013.

181.     In 2014, Begoun was interviewed for the blog "In My Bag," which reported: "Paula [Begoun] informed me that if a brand is sold in China, it's compulsory that it has to have been tested on animals . . . That is the reason, according to Paula, that she has taken the (financially challenging) decision not to sell her range there."[48]

182.     In 2014, Paula's Choice registered four products with the NMPA in China, each requiring animal testing. Paula's Choice's NMPA registrations, Ex. 4.

183.     In 2015, Begoun gave another interview where she was quoted as saying: "We were on the cusp of setting up in China and then we heard about the animal testing and we pulled out. We said 'No'. It's a billion people market. It's a big deal. But 'No.'"[49]

184.     From 2015 to 2016, Paula's Choice registered nine products with the NMPA, each requiring animal testing. Paula's Choice's NMPA registrations, Ex. 4.

185.     In 2017, Paula's Choice represented on its beautypedia.com website that it did not test on animals and included the following statement about sales in China: "IMPORTANT NOTE ABOUT COSMETICS IMPORTED TO AND SOLD IN CHINA: The Chinese government requires animal testing on all imported cosmetics sold from a physical storefront within mainland China. So, a brand that retails there (in an actual store, not exclusively online) must agree to this

---

[48] Not Tested on Animals, INMYBAG.CO.ZA (February 28, 2014), https://www.inmybag.co.za/2014/02/28/not-tested-on-animals/ (last visited Mar. 12, 2024).

[49] Meeting Paula Begoun, CAROLINEHIRONS.COM (May 19, 2015), https://www.carolinehirons.com/2015/05/meeting-paula-begoun.html (last visited Mar. 12, 2024).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

third-party testing even though they may not test on animals themselves or endorse this practice in any other country."[50]

186.    But there is no blanket exception for online sales in China. All cosmetics that are imported and sold commercially in China require registration with the NMPA, including the required animal testing, regardless of whether they are sold online or in a physical storefront.

187.    On May 25, 2017, Lei Wei, a business partner of Yang, posted a photo of with Begoun and Wang in China, promoting Paula's Choice products.[51]



188.    In 2017, Paula's Choice registered nine products with the NMPA in China, each requiring animal testing. Paula's Choice's NMPA registrations, Ex. 4.

189.    In 2018, Begoun did an interview for the Chinese website CBO, where she discussed selling Paula's Choice products in China.[52]

---

[50] Animal Testing Report Card, BEAUTYPEDIA.COM, https://web.archive.org/web/2017021807 0715/beautypedia.com/animal-testing/ (last visited Mar. 12, 2024).

[51] Lei Wei Facebook Post, FACEBOOK (May 25, 2017), https://www.facebook.com/photo?fbid =10155582878634411&set=ecnf.696059410 (last visited Mar. 12, 2024).

[52] Wu Sixin, Begoun Interview, CBO (September 15, 2018), https://www.cbo.cn/article/id/ 46097.html (last visited Mar. 12, 2024).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

190.     That article includes photos of Begoun, as well as promotional photos for Paula's Choice China.[53]





191.     From 2018 to 2020, Paula's Choice registered fifteen products with the NMPA in China, each requiring animal testing. Paula's Choice's NMPA registrations, Ex. 4.

192.     Paula's Choice products sold in China have the required product label and accompanying NMPA registration number. The following are images of a Paula's Choice product sold thorough Amazon China, showing the label and NMPA registration number:

---

[53] *Id.*

1

2

3

4

5

6

7

8

9

10



11

12

13

14

15

16

17

18

19

20



21

22

23      193.    To avoid animal testing, Paula's Choice could have availed itself of the 2014

24  regulations that allowed companies to manufacture non-special use cosmetics in China, rather than

25  import them.

26      194.    Instead, Paula's Choice continued to register and sell imported products in China

27  from 2009 to 2020, an approach that required animal testing for each product.

28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

195.     Although foreign companies have been able to set up domestic manufacturing to avoid animal testing for non-special use cosmetics since 2014, Paula's Choice waited until 2021 to engage domestic manufacturers.

196.     In 2021, Paula's Choice began bottling its products in China under the 2014 domestic manufacturing exemption, which allowed Paula's Choice to stop having its non-special use products tested on animals.

197.     That same year Paula's Choice stopped registering its products with the NMPA and cancelled several of its NMPA registrations.

198.     In total, from 2009 to 2020, Paula's Choice registered 60 products with the NMPA, with multiple registrations each year, all requiring animal testing. Paula's Choice's NMPA registrations, Ex. 4. The distribution of these registrations is as follows:

| Number of Paula's Choice Products Registered with the NMPA by Year | | | | | | | | | | | |
|------|------|------|------|------|------|------|------|------|------|------|------|
| 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 1 | 3 | 1 | 12 | 6 | 4 | 4 | 5 | 9 | 3 | 3 | 9 |

## H.     Plaintiffs

199.     Plaintiff Jesse Vargison purchased Paula's Choice products between 2018–2021.

200.     Vargison currently resides in Seattle, Washington.

201.     Vargison was first introduced to Paula's Choice through a friend who used to work in their marketing department. Before making his first purchase of Paula's Choice products he investigated and researched whether Paula's Choice products were cruelty-free, as the claim was a "selling point at the time of purchase."

202.     Vargison saw the "no animal testing" claims on the Paula's Choice website and marketing and relied on those claims in purchasing Paula's Choice products.

203.     Vargison has purchased approximately 30–40 products since 2018.

204.     Vargison would not have purchased Paula's Choice products had he known they were tested on animals.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

205.   Vargison purchased various products from Paula's Choice, including Skin Recovery Hydrating Treatment Mask, Clear Anti-Redness Exfoliating Solution, Clinical 1% Retinol Treatment, Resist Barrier Repair Moisturizer, Resist Advanced Pore-Refining Treatment 4% BHA, Skin Balancing Pore-Reducing Toner, Resist Anti-Aging Clear Skin Hydrator.

206.   The following are photos of the products he currently still has:





207.    Although all Paula's Choice products are represented as being both cruelty-free and made by a cruelty-free company, Paula's Choice obtained NMPA approval for several of Vargison's products in China, meaning those products were tested on animals in a Chinese lab.[54]

208.    Vargison generally purchased his Paula's Choice products either directly on the Paula's Choice website or from various retailers and paid the listed retail price.

209.    Vargison was not aware that Paula's Choice was testing on animals to sell in China until he contacted undersigned counsel, and no reasonable investigation would have led him to conclude otherwise.

210.    Vargison would not have continued to purchase Paula's Choice products through 2021 had he known Paula's Choice tested any of its products on animals, regardless of where that testing occurred.

211.    Plaintiff Rachael Forbis (née Laxton) has purchased Paula's Choice products since approximately 2014.

212.    Forbis currently resides in Renton, Washington.

213.    Forbis was first introduced to Paula's Choice products by her mother who also purchased products and shared them with her.

214.    Forbis further investigated and researched the product, including visiting the Paula's Choice website, to verify that the products were cruelty-free.

215.    Forbis actively looks for cruelty-free products and companies because she cares about animals and the environment.

216.    Forbis does not agree with animal testing and looks for products that are cruelty-free.

217.    Forbis relied on Paula's Choice's representations that the products she was purchasing were not tested on animals and that Paula's Choice did not perform animal testing.

---

[54] One judge has already found that where a company represents that it never tests on animals, it breaks its cruelty-free promise on all products if it tests any products on animals, including those that were not directly tested on animals.



218.     Forbis would not have purchased or continued to purchase Paula's Choice products had she known those products had been tested on animals, regardless of where that animal testing occurred.

219.     Forbis has purchased over 90 Paula's Choice products since 2014. She generally purchases her products directly on the Paula's Choice website.

220.     The last products Forbis purchased were the Weightless Body Treatment 2% BHA, the Skin-Smoothing Retinol Body Treatment and the Hydrating Gel-to-Cream Cleanser.

221.     Forbis purchased the Weightless Body Treatment 2% BHA on July 5, 2023 from the Paula's Choice website for $33.20. This image is a photo of this product:



222.     Forbis purchased the Skin-Smoothing Retinol Body Treatment and the Hydrating Gel-to-Cream Cleanser on January 27, 2023 from the Paula's Choice website for $44.92. These images are photos of these products:

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1

2

3

4

5

6

7

8

9

10

11

12

13



14

15

16

17

18

19

20

21

22

23

24

25



26      223.    In making those purchases, Forbis relied on Paula's Choice's representations that its

27  products were cruelty-free, including the representations on the bottles she purchased.

28

1

224.    Had Forbis known that Paula's Choice products were tested on animals, she would

2

not have purchased these products.

3

225.    Although all Paula's Choice products are represented as being both cruelty-free and

4

made by a cruelty-free company, Paula's Choice obtained NMPA approval for several of Forbis'

5

products in China, meaning those products were tested on animals in a Chinese lab.

6

226.    Forbis was not aware that Paula's Choice was testing on animals to sell in China

7

until she contacted undersigned counsel, and no reasonable investigation would have led her to

8

conclude otherwise.

9

227.    Forbis would not have continued to purchase Paula's Choice products through 2023

10

had she known Paula's Choice tested any of its products on animals, regardless of where that

11

testing occurred.

12

**I.      Terms of Use**

13

228.    Paula's Choice has Terms of Use on its website.

14

229.    Those Terms of Use dictate that the "laws of the United States and State of

15

Washington" will govern purchases made on its website.

16

230.    Upon information and belief, up until or around March 14, 2023, the Terms of Use

17

also dictated that website purchases would be subject to the "exclusive jurisdiction of the state and

18

federal courts sitting in the King County in the State of Washington."[55]

19

231.    On or around March 14, 2023, Paula's Choice added an arbitration clause to its

20

Terms of Use, which "will take effect once [Paula's Choice] post[s] them" on the website.[56]

21

22

23

[55] *Compare* Terms of Use, PAULA'S CHOICE (December 1, 2022), https://web.archive.org/web/20221201074026/https://help.paulaschoice.com/hc/en-us/articles/360035072673-Terms-of-Use (last

24

visited Mar. 12, 2024), *with* Terms of Use, PAULA'S CHOICE (March 14, 2023), https://web.archive.org/web/20230314223729/https://help.paulaschoice.com/hc/en-us/articles/360035072673-

25

Terms-of-Use (last visited Mar. 12, 2024).

26

[56] Terms of Use, PAULA'S CHOICE (March 14, 2023), https://web.archive.org/web/20230314223729/https://help.paulaschoice.com/hc/en-us/articles/360035072673-Terms-of-Use_ (last visited

27

Mar. 12, 2024).

28

CLASS ACTION COMPLAINT
Case No.                                                   - 42 -



1

## V.     CLASS ACTION ALLEGATIONS

2        232.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(2) and (b)(3)

3   individually and for these Classes of similarly situated persons:

4            All persons who purchased Paula's Choice products directly from
             Paula's Choice's U.S. website between December 22, 2009, and the
5            date the arbitration clause was published on Paula's Choice's U.S.
             website, but no later than March 13, 2023; and
6

7            All persons who purchased Paula's Choice products through a third-
             party retailer on or after December 22, 2009.
8

9        233.    Excluded from the Class are Paula's Choice and its co-conspirators, their officers,

10  directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or

11  affiliated companies; class counsel and their employees; and the judicial officers and their

12  immediate family members and associated court staff assigned to this case, and all persons within

13  the third degree of relationship to any such persons. The class is clear and ascertainable using the

14  objective criterion of purchases, which can be proven using Defendant's business records.

15       234.    **Numerosity**. The Class is so numerous that joinder of all members is unfeasible and

16  impracticable. Paula's Choice sells millions of products each year in hundreds of locations. The

17  exact size of the Class is easily ascertainable, as each transaction or purchase can be tracked using

18  Defendant's business records. Any reasonable estimate, based on sales, indicates there are at least

19  hundreds of thousands of Class Members.

20       235.    **Commonality and Predominance**. Questions of law and fact common to all Class

21  Members exist and predominate over questions affecting only individual Class Members,

22  including:

23            a.    Whether Defendant stated or promised on all of the skincare products or
                   packaging associated with those products that its skincare products were
24                 cruelty-free or never animal tested anywhere in the world;

25            b.    Whether Defendant advertised its skincare products by stating that Paula's
                   Choice never animal tested anywhere in the world and that it was a cruelty-
26                 free company;

27            c.    Whether Defendant performed animal testing, or had animal testing performed
                   on its behalf, on skincare products to sell them in China;

28

d.   Whether Defendant delivered skincare products to the Class that met its "cruelty-free" promise;

e.   Whether Defendant delivered skincare products to the Class that met its promise to never animal test anywhere in the world;

f.   Whether Defendant breached its express warranties with the Class Members;

g.   Whether Defendant breached its implied warranties of merchantability with the Class Members;

h.   Whether Defendant violated the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*;

i.   Whether Defendant violated Washington's Consumer Protection Act, Wash. Rev. Code § 19.86, *et seq.*; and

j.   Whether the Class was damaged by paying more for skincare products than they would have if the truth had been disclosed, and, if so, by what amount.

236.   **Typicality**. Plaintiffs' claims are typical of the claims of the other members in the Class, as they arise out of conduct of the Defendant that is common to the Class, meaning each Class Member will rely on the same evidence and actions to prove their claims, and such conduct is uniform, standard, and pervasive. Thus, the claims of each Class Member are based on the same legal theories and challenge the same practices of Defendant. Plaintiffs and all Class Members have been subjected to the same falsehoods and practices, hold the same rights, are entitled to the same legal and equitable relief, have suffered the same impact and injury, and sustained similar damage by paying an amount for skincare products that they would not have paid, or greater than they would have paid, had Paula's Choice not affirmatively misrepresented that its skincare products were cruelty-free and never animal tested.

237.   **Adequacy**. Plaintiffs and their counsel will fairly and adequately represent the interests of the Class Members. Plaintiffs have no interests antagonistic to, or in conflict with, the interests of the other Class Members, and they will zealously pursue their claims. Plaintiffs' lawyers are highly experienced in the prosecution of consumer class actions and complex commercial litigation, capable of providing the financial resources needed to litigate this matter to conclusion, and have litigated other consumer rights matters in a class context.

CLASS ACTION COMPLAINT
Case No.
- 44 -



238.    **Superiority**. A class action is superior to all other available methods for fairly and efficiently adjudicating the claims of Plaintiffs and the Class Members. Plaintiffs and the Class Members—many of whom are unaware of their rights—have been harmed by Defendant's misrepresentations. Litigating this case as a class action reduces the possibility of repetitious litigation relating to Defendant's wrongful actions and provides an efficient mechanism for adjudication for Class Members, whose claims are too small to warrant individual litigation and Defendant has concealed the truth, thereby preventing Class Members from recognizing and evaluating their rights and claims.

239.    **Injunctive and Declaratory Relief**. Paula's Choice has acted or refused to act on grounds that apply generally to the Class and final injunctive relief, or corresponding declaratory relief is appropriate respecting the Class as a whole.

## VI.    COUNTS

### COUNT I

### BREACH OF EXPRESS WARRANTY UNDER THE UNIFORM COMMERCIAL CODE

240.    Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

241.    Paula's Choice sells skincare products, which qualify as goods under the Uniform Commercial Code. Wash. Rev. Code § 62A.2-105.

242.    Plaintiffs purchased various Paula's Choice skincare products during the class period.

243.    In connection with the sale of goods, including through representations on the products themselves, Paula's Choice expressly affirmed and warranted that it was a cruelty-free company, and its skincare products were never animal tested anywhere in the world. Wash. Rev. Code § 62A.2-313(1)(a).

244.    Paula's Choice's affirmations are part of the basis of the bargain with Plaintiffs. *Id.*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

245.     Paula's Choice breached its express warranty that it was a cruelty-free company and its products were never animal tested anywhere in the world by conducting animal tests in China in order to register and sell its products there.

246.     Plaintiffs notified Paula's Choice of the nonconformities in the skincare products on December 21, 2023, which was a reasonable time after Plaintiffs discovered the breach. *See* Wash. Rev. Code § 62A.2-607(3)(a).

247.     Because of Paula's Choice's breach of its express warranty, Plaintiffs have suffered damages valued at the difference between the value of a skincare product they received and the value of the skincare product they were promised, in an amount to be proven at trial. Wash. Rev. Code § 62A.2-714.

## COUNT II

## BREACH OF IMPLIED WARRANTY UNDER THE UNIFORM COMMERCIAL CODE

248.     Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

249.     Paula's Choice sells skincare products, which qualify as goods under the Uniform Commercial Code. Wash. Rev. Code § 62A.2-105.

250.     Plaintiffs purchased various Paula's Choice skincare products during the class period.

251.     The implied warranty of merchantability requires a product to conform to the promises or affirmation of fact made on any container or label. Wash. Rev. Code § 62A.2-314.

252.     In connection with the sale of goods, including through representations on the containers and labels themselves, Paula's Choice's products have an implied warranty of merchantability that its skincare products were never animal tested anywhere in the world and that it is a cruelty-free company.

253.     Paula's Choice breached its implied warranty of merchantability that its products were never animal tested anywhere in the world and it was cruelty-free company by conducting animal tests in China to register and sell its products there.

CLASS ACTION COMPLAINT
Case No.                                    - 46 -

254.     Plaintiffs notified Paula's Choice of the nonconformities in the skin care products on December 21, 2023, which was a reasonable time after Plaintiffs discovered the breach. Wash. Rev. Code § 62A.2-607(3)(a).

255.     Because of Paula's Choice's breach of its implied warranty, Plaintiffs have suffered damages valued at the difference between the value of a skincare product they received and the value of the skincare product they were promised, in an amount to be proven at trial. Wash. Rev. Code § 62A.2-714.

**COUNT III**

**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**15 U.S.C. § 2301, *ET SEQ*.**

256.     Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

257.     Paula's Choice products are "consumer products" under the Magnuson-Moss Warranty Act, as they are distributed in commerce and used for personal, family, or household purposes. 15 U.S.C. § 2301(1).

258.     Plaintiffs are "consumers" under the Magnuson-Moss Warranty Act, as they are buyers of a consumer product. 15 U.S.C. § 2301(3).

259.     Paula's Choice is a "supplier" and "warrantor" under the Magnuson-Moss Warranty Act, as it is a supplier who made consumer products and it gave a written warranty on its skincare products, specifically that it is a cruelty-free company and its products are never animal tested anywhere in the world. 15 U.S.C. § 2301(4)–(5).

260.     Paula's Choice's representations constitute an "implied warranty" under the Magnuson-Moss Act and Washington law. 15 U.S.C. § 2301(7) ("The term "implied warranty" means an implied warranty arising under State law.").

261.     Paula's Choice breached its implied warranty of merchantability that its products were never animal tested anywhere in the world and it was cruelty-free company by conducting animal tests in China to register and sell its products there.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

262.    Plaintiffs notified Paula's Choice of the nonconformities in the skincare products on December 21, 2023, which was a reasonable time after Plaintiffs discovered the breach. 15 U.S.C. § 2310.

263.    Plaintiffs individually and on behalf of the other Class Members, seek damages or any other equitable and legal relief available under 15 U.S.C. § 2310(d)(1).

264.    Plaintiffs, individually and on behalf of the other Class Members, seek costs of court, attorneys' fees under 15 U.S.C. § 2310(d)(2).

**COUNT IV**

**VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT ("CPA") WASH. REV. CODE § 19.86, *ET SEQ.***

265.    Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

266.    Paula's Choice is engaged in trade or commerce under Wash. Rev. Code § 19.86.10.

267.    The CPA declares "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . unlawful." Wash. Rev. Code § 19.86.020.

268.    Paula's Choice engaged in unfair or deceptive acts or practices that violated the CPA, as described herein, by representing, certifying, and advertising that its skincare products are cruelty-free and never animal tested anywhere in the world, when Paula's Choice in fact tested its products on animals in order to register and sell such products in China.

269.    Paula's Choice's actions occurred in conduct of Paula's Choice trade or commerce, specifically the sale of goods to consumers.

270.    Paula's Choice's actions affected the public interest, as it injured Plaintiffs, had the capacity to injure other persons, and continues to have "the capacity to injure other persons." Wash. Rev. Code § 19.86.093.

271.    Paula's Choice's misrepresentations that Paula's Choice's skincare products had never been animal tested anywhere in the world and were cruelty-free, as set forth, were material and had the capacity to deceive a substantial portion of the public.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

272. In purchasing Paula's Choice products, Plaintiffs and the Class relied on the misrepresentations of Paula's Choice regarding its stance on animal testing and that its products were never tested on animals. Paula's Choice's representations turned out not to be true because it tested on animals to sell its products in China.

273. Had Plaintiffs and the other Class Members known they would not receive products that had never been animal tested, they would not have purchased Paula's Choice's skincare products and/or paid as much for them.

274. Plaintiffs suffered ascertainable loss caused by Paula's Choice's misrepresentations and its concealment of and failure to disclose the use of animal testing in Plaintiffs' products.

275. Under Wash. Rev. Code § 19.86.090, Plaintiffs, individually and on behalf of the other Class Members, seek actual damages against Paula's Choice for the harm caused by Paula's Choice's violations of the CPA as alleged.

276. Under Wash. Rev. Code § 19.86.090, Plaintiffs, individually and on behalf of the other Class Members, seek actual damages against Paula's Choice for the harm caused by Paula's Choice's violations of the CPA as alleged. Plaintiffs also seek treble damages because Paula's Choice intentionally and willfully misrepresented material facts that only it knew, specifically that it performed no animal testing and its products were cruelty-free.

277. Plaintiffs seek an order enjoining Defendant's unfair or deceptive acts or practices under Wash. Rev. Code § 19.86.090. Plaintiffs will serve a copy of this Complaint on the attorney general of Washington in compliance with Wash. Rev. Code § 19.86.095.

278. Plaintiffs, individually and on behalf of the other Class Members, seek costs of court, attorneys' fees under Was Rev. Code § 19.86.090, and any other just and proper relief available under the CPA.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and for members of the Class, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A. Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel and Plaintiffs as Class Representatives;

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

B.      An order temporarily and permanently enjoining Defendant from continuing the unfair methods of competition and unfair or deceptive acts or practices alleged in this Complaint, including its representation that it has never animal tested;

C.      Restitution and/or damages, each in an amount to be determined by the trier of fact;

D.      Treble damage award;

E.      Pre- and post-judgment interest on any amounts awarded;

F.      An award of costs and attorneys' fees where authorized by law; and

G.      Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

DATED: March 14, 2024                     HAGENS BERMAN SOBOL SHAPIRO LLP


By */s/ Sean R. Matt*
    Sean R. Matt (WSBA No. 21972)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: sean@hbsslaw.com

Robert B. Carey (*Pro Hac Vice forthcoming*)
Michella A. Kras (*Pro Hac Vice forthcoming*)
Alisa V. Sherbow (*Pro Hac Vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
        michellak@hbsslaw.com
        alisas@hbsslaw.com

*Attorneys for Plaintiffs*