UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JESSE VARGISON and RACHAEL FORBIS, individually and on behalf of themselves and all others similarly situated, et al.,<br><br>                    Plaintiffs,<br><br>        v.<br><br>PAULA'S CHOICE, LLC, et al.,<br><br>                    Defendants. | CASE NO. 2:24-cv-00342-TL<br><br>ORDER ON MOTION TO COMPEL ARBITRATION AND STAY LITIGATION AS TO CERTAIN NAMED PLAINTIFFS |

This matter comes before the Court on Defendant Paula's Choice, LLC's ("Paula's Choice") Motion to Compel Arbitration and to Stay Litigation as to Certain Named Plaintiffs. Dkt. No. 48. Having considered the motion, Plaintiffs' response (Dkt. No. 57), Paula's Choice's reply (Dkt. No. 61), the supplemental materials provided by the Parties (Dkt. Nos. 49, 58, 62), and the relevant record, the Court GRANTS IN PART and HOLDS IN ABEYANCE IN PART Paula's Choice's motion.

# I.    BACKGROUND

Paula's Choice is a company that manufactures and sells skincare products. *See* Dkt. No. 37 ¶¶ 131, 138 ("Amended Complaint"). In the underlying complaint, some 107 plaintiffs have brought this action against Paula's Choice, alleging, among other things, that the company misrepresented to consumers that its products were "cruelty-free" and "never tested on animals," despite "conducting animal tests in China in order to register and sell its products there." *Id.* ¶¶ 9–115, 145, 1246. Plaintiffs have also named as Defendants Sephora USA, Inc. ("Sephora") and THG Beauty USA LLC ("THG Beauty"), two retailers by whom Paula's Choice products are sold. *Id.* ¶¶ 117–118. In the instant motion, Paula's Choice seeks to compel eight particular Plaintiffs to arbitrate their claims against the company, pursuant to an arbitration clause found in the company's Terms of Use. Dkt. No. 48 at 6; *see* Dkt. No. 49 at 31–32 (arbitration provision in Terms of Use). "Given their agreements to arbitrate," Paula's Choice asserts, "their claims do not belong in this Court." Dkt. No. 48 at 6.

Paula's Choice obliges its customers to accept its Terms of Use when making purchases on its website. *See* Dkt. No. 48 at 15; *see also* Dkt. No. 49 at 28–33 ("Terms of Use"). Prior to on or about March 14, 2023, the Terms of Use did not include an agreement to arbitrate. Dkt. No. 37 ¶ 1226. But on or about that date, the company added such an agreement to its Terms of Use. *Id.*; *see* Dkt. No. 59 at 31–32.

The arbitration provision states, among other things, that: "[CUSTOMERS] AND PAULA'S CHOICE EACH AGREE THAT ANY AND ALL DISPUTES OR CLAIMS THAT ARISE OR HAVE ARISEN BETWEEN YOU AND PAULA'S CHOICE SHALL BE RESOLVED EXCLUSIVELY THROUGH FINAL AND BINDING ARBITRATION RATHER THAN IN COURT." Dkt. No. 48 at 17; Dkt. No. 49 at 31 (capitals in original). The arbitration provision also includes a class-action waiver, which requires that customers bring any claims

1   against the company on an individual basis: "You and Paula's Choice agree that each of us may

2   bring claims against the other only on an individual basis and not as a plaintiff or class member in

3   any purported class or representative action or proceeding." Dkt. No. 48 at 17; Dkt. No. 49 at 32.

4       Consequently, from Paula's Choice's perspective, customers who made purchases from

5   the website after March 14, 2023, are subject to the updated Terms of Use and the mandatory

6   arbitration provision quoted above—and are therefore barred from participating as plaintiffs in

7   this lawsuit. *See* Dkt. No. 48 at 16. Plaintiffs, however, dispute the validity of the arbitration

8   provision and assert that because they never agreed to it, it is unenforceable against them. *See*

9   Dkt. No. 57 at 5–6.

## II.     LEGAL STANDARD

11      The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 2 *et seq.*, governs arbitration

12  agreements in most contracts affecting interstate commerce. *See Circuit City Stores, Inc. v.*

13  *Adams*, 532 U.S. 105, 119 (2001) (holding that only contracts of employment of transportation

14  workers are exempted from FAA's coverage). District courts have jurisdiction to determine

15  whether there is an agreement to arbitrate a particular issue, "unless the parties clearly and

16  unmistakably provide otherwise." *In re Van Dusen*, 654 F.3d 838, 843 (9th Cir. 2011).

17      In deciding whether to compel arbitration, a court's inquiry is generally limited to two

18  "gateway" issues: "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether

19  the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,

20  207 F.3d 1126, 1130 (9th Cir. 2000). If both conditions are met, "the [FAA] requires the court to

21  enforce the arbitration agreement in accordance with its terms." *Id.* Arbitration agreements "shall

22  be valid, irrevocable, and enforceable" in the absence of legal or equitable grounds such as fraud,

23  duress, or unconscionability. 9 U.S.C. § 2; *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333,

24  339 (2011) (internal citations omitted). Where "[t]he crux of the complaint is that the contract as

a whole (including its arbitration provision) is . . . invalid," even the validity of the contract becomes a question for the arbitrator to decide. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444–46 (2006).

A motion to compel arbitration "is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate," so courts apply the summary judgment standard when evaluating such a motion. *Hansen v. LMB Mortg. Serv., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021). Therefore, any evidentiary doubts are resolved in favor of the non-moving party. However, "[if] a district court concludes that there are genuine issues of material fact as to whether the parties formed an arbitration agreement, the court must proceed without delay to a trial on arbitrability and hold any motion to compel arbitration in abeyance until the factual issues have been resolved." *Id.*; *see* 9 U.S.C. § 4.

## III.    DISCUSSION

### A.    Plaintiffs Who Made Purchases After Defendant's Motion

As an initial matter, the Court notes that three of the eight Plaintiffs—Dalit Cohen, Bridget Froelich, and Maura McCartan—made at least one additional purchase on the Paula's Choice website *after* Paula's Choice filed its motion to compel arbitration. *See* Dkt. No. 61 at 17; Dkt. No. 62 ¶ 22. Paula's Choice filed the instant motion to compel on October 15, 2024. Dkt. No. 48. Cohen made purchases on November 28, 2024, and December 13, 2024; Froelich made purchases on October 19, 2024, November 26, 2024, November 27, 2024, and December 4, 2024; McCartan made a purchase on November 4, 2024. *See* Dkt. No. 62 ¶ 22. As Named Plaintiffs in this case, and specifically as the subjects of the instant motion to compel, these three Plaintiffs were put on notice of the existence of the arbitration agreement (and their acceptance thereof upon making a purchase) when Paula's Choice raised the issue in the ongoing litigation. *See Nicosia v. Amazon.com, Inc.*, 815 F. App'x 612, 613–14 (2d Cir. 2020) (applying

Washington law and holding that "[Plaintiff] received notice of the arbitration clause no later than . . . when [Defendant] filed a letter motion in this litigation raising the arbitration clause as a ground for dismissal."). Plaintiffs' continuing to make purchases despite the ongoing litigation—particularly as it relates to notice and acceptance of the Terms of Use—is "conduct that a reasonable person would understand to constitute assent." *In re Ring LLC Privacy Litig.*, No. C19-10899, 2021 WL 2621197, at *7 (C.D. Cal. June 24, 2021) (internal quotation marks and citation omitted).[1] These three Plaintiffs' post-motion purchases demonstrate their assent to the website's updated Terms of Use, including the arbitration provision. And importantly, when they assented to the updated Terms of Use—and the newly included arbitration agreement—they agreed to arbitrate with Paula's Choice "disputes or claims that arise *or have arisen*." Dkt. No. 49 at 31 (capitals removed) (emphasis added). That is, even those disputes or claims that pre-date the arbitration agreement fall within its scope. *See Trudeau v. Google LLC*, 349 F. Supp. 3d 869, 878 (N.D. Cal. 2018) (finding that, under the unambiguous terms of the arbitration agreement, claims that pre-date arbitration agreement are within its scope), *aff'd* 816 F. App'x 68 (9th Cir. 2020). Plaintiffs Cohen, Froelich, and McCartan might have maintained claims that *were* eligible to be litigated in court, but once they assented to the updated Terms of Use, the arbitration agreement extinguished such eligibility. *See Sanfilippo v. Tinder, Inc.*, No. C18-8372, 2018 WL 6681197, at *5 (C.D. Cal. Dec. 18, 2018) (compelling arbitration of claims that pre-date arbitration agreement where agreement "d[id] not appear to intend to limit arbitration to future claims"), *aff'd sub nom. Sanfilippo v. Match Group LLC*, No. 20-55819, 2021 WL 4440337, at *2 (9th Cir. Sept. 28, 2021).

---

[1] Plaintiffs could have sought leave from the Court to submit additional briefing in response to Paula's Choice's assertions about the ramifications of Cohen's, Froelich's, and McCartan's subsequent purchases on the website—assertions that were, necessarily, raised for the first time in a reply brief, since the purchases were made after the motion was filed—but they opted not to do so.

With respect to these Plaintiffs' claims against Defendants Sephora and THG Beauty—Parties with whom Cohen, Froelich, and McCartan do not have an arbitration agreement—"it is in the Court's discretion whether to stay, for considerations of economy and efficiency, an entire action, including issues not arbitrable, pending arbitration." *Maguire Ins. Agency, Inc. v. Amynta Agency, Inc.*, 652 F. Supp. 3d 1313, 1327 (W.D. Wash. 2023) (quoting *Kater v. Churchill Downs Inc.*, No. C15-612, 2019 WL 3944323, at *1 (W.D. Wash. Aug. 21, 2019)). Courts "generally grant" stays when "the plaintiff's claims against a non-signatory defendant are intertwined with their arbitrable claims against another defendant." *Kater*, 2019 WL 3944323, at *2. Further, "[i]f the four corners of the complaint make clear that the non-arbitrable claims depend upon the same facts as and are inherently separable from the remainder of the arbitrable claims, a stay of all claims is appropriate." *Smiles Servs. LLC v. Frye*, No. C23-5492, 2023 WL 6066683, at *2 (W.D. Wash. Sept. 18, 2023) (quoting *Maguire Ins.*, 652 F. Supp. 3d at 1328) (cleaned up).

Here, it is not clear from the four corners of the Amended Complaint that Plaintiffs Cohen, Froelich, and McCartan have claims against Sephora and THG Beauty that "depend on the same facts as and are inherently separable from" their arbitrable claims against Paula's Choice. As to these Plaintiffs' respective purchase(s) of Paula's Choice products, the Amended Complaint asserts that each "purchased Paula's Choice products either directly from Paula's Choice *or* from a third-party retailer on or after December 22, 2009." Dkt. No. 37 ¶¶ 348, 390, 796 (emphasis added). Plaintiffs' decision not to identify the retailer from whom these Plaintiffs purchased their Paula's Choice merchandise renders it unclear whether these Plaintiffs even have claims against Sephora and THG Beauty. Moreover, "[i]f the Court stayed the entire litigation and allowed [Cohen's, Froelich's, and McCartan's] arbitrations to proceed to completion first, it is unclear what preclusive effect the arbitrations would have on [these Plaintiffs'] remaining

class action claims." *Gile v. Dolgen Cal., LLC*, No. C20-1863, 2022 WL 649279, at *2 (C.D. Cal. Jan. 14, 2022).

For its part, Paula's Choice asserts only that a "stay should also apply as to these Plaintiffs' claims to the extent asserted against Defendants Sephora or THG Beauty USA, although none of these eight Plaintiffs has alleged that they made a purchase from Sephora and Dermstore[2] and thus have such a claim." Dkt. No. 48 at 29. Nor does the arbitration clause in Paula's Choice's Terms of Use appear to apply to Defendants Sephora or THG Beauty, as the relevant language is limited and specific to Paula's Choice: A customer agrees that "ANY AND ALL DISPUTES OR CLAIMS THAT ARISE OR HAVE ARISEN *BETWEEN YOU AND PAULA'S CHOICE* SHALL BE RESOLVED EXCLUSIVELY THROUGH FINAL AND BINDING ARBITRATION." Dkt. No. 49 at 31 (capitals in original) (emphasis added). Presented with no good reason to set the stage for what would potentially become a third act in this drama—that is, further judicial proceedings after both the pending lawsuit now before the Court and the three Plaintiffs' compelled arbitration with Paula's Choice—the Court declines to stay any claims Cohen, Froelich, and McCartan might have against Sephora and THG Beauty. Therefore, the Court GRANTS Paula's Choice's motion to compel arbitration as to Plaintiffs Cohen, Froelich, and McCartan, and STAYS these Plaintiffs' claims against Paula's Choice, pending arbitration.

**B.    Other Plaintiffs**

The Court now turns to the five Plaintiffs who did not make purchases after Paula's Choice filed its Motion: Bartholomew-King, Bridges, Erriquez, van der Steeg, and Wright. "The cardinal precept of arbitration is that it is 'simply a matter of contract between the parties; it is a

---

[2] Dermstore.com is operated by THG Beauty LLC. *See* Dkt. No. 37 ¶ 118.

way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration.'" *Ahlstrom v. DHI Mortg. Co., Ltd.*, 21 F.4th 631, 634 (9th Cir. 2021) (quoting *Loc. Joint Exec. Bd. v. Mirage Casino-Hotel, Inc.*, 911 F.3d 588, 595 (9th Cir. 2018) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995))). "Because of this axiomatic principle, a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id.* (quoting *Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1041 (9th Cir. 2020)). Accordingly, the United States Supreme Court has instructed that "courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement nor (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue." *Id.* (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010)). "Thus, 'where a party contests either or both matters, the court must resolve the disagreement.'" *Id.* (quoting *Granite Rock*, 561 U.S. at 299–300). As articulated above, the summary-judgment standard is appropriate when making this determination. *Hansen*, 1 F.4th at 670.

### 1.    Governing Law

In determining whether a contract exists, courts must apply "ordinary state-law principles that govern the foundation of contracts." *First Options of Chi., Inc.*, 514 U.S. at 944; *see also Marshall v. Hipcamp Inc.*, No. C23-6156, 2024 WL 2325197, at *3 (W.D. Wash. May 22, 2024). "The Court, sitting in diversity, applies the forum state's choice of law rules." *Marshall*, 2024 WL 2325197, at *3 (citing *Atl. Marine Const. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. 49, 65 (2013)).

"Under Washington law, the threshold question is whether there is an actual conflict with another state's law." *Id.* (citing *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 103, 864 P.2d 937 (1994)). "An actual conflict of law exists where the result of an issue is different under the

laws of the interested states." *Woodward v. Taylor*, 184 Wn.2d 911, 917, 366 P.3d 432 (2016). If there is no actual conflict, the Court applies "the presumptive local law." *Erwin v. Cotter Health Ctrs.*, 161 Wn.2d 676, 692, 167 P.3d 1112 (2007).

In this matter, the presumptive local law is that of Washington. *See Burnside*, 123 Wn.2d at 100 (establishing "several principles that serve as a useful starting point in choice of law analysis," including that "the normal expectation should be that the rule of decision will be supplied by the domestic law as a matter of course"; that "[t]he court should ordinarily depart from this procedure only at the instance of a party wishing to obtain the advantage of a foreign law"; and that "[t]he law of the forum . . . should normally be displaced only by the interested party's timely invocation of the foreign law"). Neither Party expressly asserts that the instant motion is governed by Washington (or any other state's) contract law. However, both Plaintiff and Defendant apply Washington law in their briefing and cite as authority federal cases that apply Washington law. *See, e.g.*, Dkt. No. 48 at 21; Dkt. No. 57 at 14.[3] As neither party has invoked any foreign law and no "actual conflict of law" exists, the Court will apply Washington law to determine whether the eight Plaintiffs with whom Paula's Choice now seeks to compel arbitration are bound by the company's Terms of Use.

### 2. Formation of a Contract

"Contract formation requires mutual assent." *Marshall*, 2024 WL 2325197, at *5 (citing *Reichart v. Rapid Invs., Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) (applying Washington law) (citing *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014)). In the online

---

[3] A choice-of-law clause in the Paula's Choice Terms of Use provides that Washington law governs use of the company's website. *See* Dkt. No. 58-10 at 6. "But whether the choice of law provision applies depends on whether the parties agreed to be bound by [the] Terms of Use in the first place." *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). This is precisely the issue under examination here and, therefore, the Court cannot presumptively apply the choice-of-law provision.

1    context, mutual assent "turns on whether the consumer had reasonable notice of the terms of

2    service agreement." *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1219 (9th Cir. 2019) (applying

3    Washington law). There are two general types of online contracts: "clickwrap" agreements,

4    which present "users with specified contractual terms on a pop-up screen [where] users must

5    check a box explicitly stating 'I agree' in order to proceed," and "browsewrap" agreements,

6    where the website "offers terms that are disclosed only through a hyperlink." *Berman v. Freedom*

7    *Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). In contrast to clickwrap agreements,

8    which are routinely considered enforceable, browsewrap agreements are less commonly enforced

9    "because consumers are frequently left unaware that contractual terms were even offered, much

10   less that continued use of the website will be deemed to manifest acceptance of those terms." *Id.*

11        Ninth Circuit courts have also recognized a subspecies of agreement called "modified

12   clickwrap." *See, e.g.*, *Rocha v. Urban Outfitters, Inc.*, No. C23-542, 2024 WL 393486, at *3

13   (N.D. Cal. Feb. 1, 2024); *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 763 (N.D. Cal.

14   2019); *see also Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1176–77 (9th Cir. 2014). "These

15   contracts exist where a 'signup screen states that acceptance of a separate agreement is required

16   before the user can access the service.'" *Rocha*, 2024 WL 393486, at *3 (citing *JUUL Labs*, 402

17   F. Supp. 3d at 763). "Courts are 'more willing to find the requisite notice for constructive assent

18   where the browsewrap agreement resembles a clickwrap agreement . . . [and] the website

19   contains an explicit textual notice that continued use will act as a manifestation of the user's

20   intent to be bound.'" *Id.* (quoting *Nguyen*, 763 F.3d at 1176–77).

21        Courts confronted with online agreements have devised rules to determine whether

22   meaningful assent has been given in order to avoid the unfairness of enforcing contractual terms

23   that consumers never intended to accept. *See Patrick v. Running Warehouse, LLC*, 93 F.4th 468,

24   476 (9th Cir. 2024) (citing *Berman*, 30 F.4th at 856). Unless a website operator can show actual

knowledge of an agreement by a consumer, an enforceable contract will be found only where: "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.*; *see also Wilson*, 944 F.3d at 1220. "Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility." *Id.* (quoting *Berman*, 30 F.4th at 856).

To determine whether a website provides reasonably conspicuous notice, courts consider, among other things, "the transactional context, the notice's size relative to other text on the site, the notice's proximity to the relevant button or box the user must click to complete the transaction or register for the service, and whether the notice's hyperlinks are readily identifiable." *Berman*, 30 F.4th at 868 (Baker, J., concurring). "[The] notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Id.* at 856. Additionally, "while it is permissible to disclose terms and conditions through a hyperlink, the fact that a hyperlink is present must be readily apparent. Simply underscoring words or phrases . . . will often be insufficient to alert a reasonably prudent user that a clickable link exists." *Id.* at 857. "Customary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage." *Id.* "Ultimately, 'the conspicuousness and placement of the Terms of Use hyperlink, other notices given to users of the terms of use, and the website's general design all contribute to whether a reasonably prudent user would have inquiry notice of a browsewrap agreement.'" *Benson v. Double Down Interactive, LLC*, No. C18-525, 2018 WL 5921062, at *3 (W.D. Wash. Nov. 13, 2018) (quoting *Nguyen*, 763 F.3d at 1177).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

### 3.    Notice of Terms of Use

Here, the Notice in question on Paula's Choice's website reads, "By continuing, you agree to our <u>Terms of Use</u>. For more information about our privacy practices, please see our <u>Privacy Policy</u>." Dkt. No. 48 at 10. "Terms of Use" and "Privacy Policy" are underlined and hyperlinked; the hyperlinked and non-hyperlinked text are displayed in the same color. *Id.*

### a.    *Disputed Notices in the Purchasing Process*

The Parties dispute whether a Paula's Choice customer actually encounters the Notice when purchasing products on the website. *Compare* Dkt. No. 48 at 20 ("[Plaintiffs] affirmatively assented to the Terms at least twice during the checkout process."), *with* Dkt. No. 57 at 7 ("A returning customer—such as the Plaintiffs here—can purchase products from the Paula's Choice desktop or mobile website without once seeing any reference to the Terms of Use."). This is a genuine issue of material fact. *See* Fed. R. Civ. P. 56(a). Along with its reply brief, Paula's Choice provides a declaration and exhibits that illustrate the multipage purchase flow for some, but not all, of the remaining five Plaintiffs. *See generally* Dkt. No. 62 at 8–26. But Plaintiffs did not seek the Court's leave to file any rebuttal to this evidence and, in any event, Paula's Choice's submissions do not cover all five Plaintiffs for whom the existence of an agreement to arbitrate remains in dispute.

The Court notes that the Parties appear to agree that, at the very least, a customer is presented with the Notice on the "Order Review/Submit Order" page from which a customer submits their order for purchase. *See* Dkt. No. 57 at 9. Plaintiffs argue that it is possible to submit an order from this page without having seen the Notice, depending on the size and resolution of a customer's screen, as well as the customer's willingness to scroll through the entire page, but they do not suggest that the Notice is completely absent. *Id.* In other words, it is undisputed that the Notice *can* be seen on that page; that is, the Notice is part of the "design element" of the

"Order Review/Submit Order" page. *See Berman*, 30 F.4th at 857. If the Notice on the "Order Review/Submit Order" page is sufficient, then the Court need not concern itself with the dispute over whether the notice appears on other pages—after all, all customers can see the Notice on that page. But if the "Order Review/Submit Order" Notice is not sufficient, then whether customers may have seen the Notice on a different page, at other times in the purchasing process, is crucial to determining whether customers agreed to the Terms of Use. *See Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 516 (9th Cir. 2023) (finding sufficient notice where it was "conspicuously displayed directly above or below the action button *at each of three independent stages that a user must complete* before purchasing tickets" (emphasis added)). In other words, the frequency with which a customer is presented with the notice—and/or its serial presentation in the purchasing process—can augment its sufficiency. The Court will thus first examine the sufficiency of the Notice on the "Order Review/Submit Order" page under the principles established by the Ninth Circuit in *Berman*.

### b. *"Order Review/Submit Order" Page Notice*

Plaintiffs argue that the Notice on the "Order Review/Submit Order" page is insufficient to bind customers to the Terms of Use. They assert that the text appears in "hard-to-read fine print [that] does not conspicuously inform the customer that the Terms of Use are linked at all, as they appear in small black font." Dkt. No. 57 at 18. Further, "[t]he words 'Terms of Use' are merely underscored," and do not appear in "a different color, all capital letters, a prominent button, [or include] other unambiguous design elements to signal that a link exists." *Id.* at 18–19. When all these purported shortcomings are taken into consideration, Plaintiffs argue, Paula's Choice's "failure to provide conspicuous notice of the [Terms of Use] means they cannot be enforced." *Id.* at 19.

Ninth Circuit precedent supports Plaintiffs' position. In *Berman*, the Court of Appeals found that a website did not provide reasonably conspicuous notice of the terms and conditions where "[t]he text disclosing the existence of the terms and conditions . . . is printed in a tiny gray font considerably smaller than the font used in the surrounding website elements." *Berman*, 30 F.4th at 856. The "comparatively larger font" and "overall design of the website . . . draw[s] the user's attention away from the barely readable critical text." *Id.* at 857; *see Rocha*, 2024 WL 393486, at *4. The websites examined by *Berman* are reproduced below:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18  *Berman*, 30 F.4th at 859–61 (App'x A & App'x B).

19      Paula's Choice's website suffers from the same deficiencies. The Court notes that the text

20  of the Notice is small and placed against a gray background, in contrast to the other information

21  on the screen, which appears against a white background, in significantly larger type. *See* Dkt.

22  No. 48 at 9, 10, 11. This has the effect of de-emphasizing the link to the Terms of Use, as the

23  reduced contrast makes text on the rest of the screen appear highlighted. The tiny typeface

24  exaggerates the effect.



Dkt. No. 48 at 15.

For its part, Paula's Choice asserts that its "Terms of Use were noticeably hyperlinked, using either differently colored font or underlined text." *Id.* at 22. Paula's Choice compares its call-out to its Terms of Use with that in *Grant v. T-Mobile USA, Inc.*, where a court in this District held that a company's hyperlink to its Agreement to Arbitrate was conspicuous "because, *inter alia*, 'the color contrast between the hyperlink—black—and the background screen—white—was conspicuous enough to allow [plaintiff] to easily see the Agreement

hyperlink, rather than it being obscured from view.'" *Id.* at 23 (quoting *Grant v. T-Mobile USA, Inc.*, No. C23-1946, 2024 WL 3510937, at \*4 (W.D. Wash. July 23, 2024)).

But Paula's Choice's use of "*inter alia*" obscures a significant piece of the *Grant* court's reasoning. The court there noted that the hyperlink, "*importantly*, is labeled with '(PDF)' next to the name of the document." *Grant*, 2024 WL 3510937, at \*4 (emphasis added). The court "f[ound] that the inclusion and proximity of the file type in the hyperlinked text weigh[ed] in favor of a reasonable user likely surmising that the underlined text differed from other plain text in that it provides a clickable pathway to the Agreement." *Id.* Further, T-Mobile's hyperlink was accompanied by a boldfaced *command* to **"Read these 3 documents from your company to accept your award."** *Id.* at \*1 (boldface in original). T-Mobile also provided notice to users that one of the documents they were directed to read was specifically entitled "Mutual Agreement to Arbitrate." *Id.* T-Mobile then informed users a second time that by clicking on the "Accept your award" link, users confirmed that they had "opened, read, underst[ood], and agree[d] to the documents above, including the Mutual Agreement to Arbitrate." *Id.* Finally, these two notices about the arbitration agreement were placed directly above the "Accept your award" button, as depicted below.

*Grant*, 2024 WL 3510937, at *1. In contrast, Paula's Choice meekly advises customers that, "[b]y continuing, [they] agree to our Terms of Use." Dkt. No. 48 at 9.

Paula's Choice also compares its Terms of Use hyperlink to that in *Pizarro v. QuinStreet, Inc.*, which the district court found reasonably conspicuous because it "appear[ed] directly below the 'See My Rates' button, [was] set off by ample white spacing, and [was] primarily surrounded by text no larger than the notice itself." No. C22-2803, 2022 WL 3357838, at *3 (N.D. Cal. Aug. 15, 2022). The *Pizarro* court also credited "the general design of the webpage, which is comprised of only two data fields, is relatively uncluttered and has a muted, essentially uniform, color scheme." *Id.*



*Id.* at *1.

But although this case is more apposite than *Grant*, the Court finds it significant that the *Pizarro* notice specifically referenced the textual language on the button that consumers clicked to agree to the terms of use and advance to the next screen. Paula's Choice, in contrast, advises

vaguely that a customer accepts its Terms of Use by "continuing." Dkt. No. 48 at 9. As Plaintiffs ask, highlighting the ambiguity, "Continuing to what? The text fails to specify what specific action . . . the customer takes to indicate agreement to the Terms." Dkt. No. 57 at 19. In *Kuhk v. Playstudios, Inc.*, this Court found it significant that the action *described* in website's notice ("By clicking connect, you agree to our terms of service and privacy policy") did not correspond to the action *taken by customers*—that is, there was no "connect" button to click. No. C24-460, 2024 WL 4529263, at *7 (W.D. Wash. Oct. 18, 2024). Paula's Choice's website suffers from a similar infirmity.

Finally, the respective notices of terms were positioned directly above the "Accept Your Award" button in *Grant* and the "See My Rates" button in *Pizarro*, making it difficult for a user miss the notices when navigating to the action button. But on the Paula's Choice website, there is not only a gap between the notice of the terms and the "Submit Order" button at the bottom of the page, but also a "Submit Order" button at the *top* of the same page, making it unnecessary for customers to even scroll all the way down to the Notice prior to placing their orders. Put differently, the design of Paula's Choice's website *facilitated* a customer's overlooking or ignoring the Notice.

Therefore, under the Ninth Circuit's standard established in *Berman*, the Court finds that Paula's Choice's notice is not reasonably conspicuous as it appears on the "Order Review/Submit Order" page. If that were the only instance where the Plaintiffs at issue encountered the Notice, then it would not be enforceable against them.

\*    \*    \*

But as discussed above, the "Order Review/Submit Order" page might *not* be the only instance where Plaintiffs encountered the Notice. Because Paula's Choice's Notice of its Terms of Use might have been presented more frequently and more robustly than in the one-time Notice

1    analyzed above, the Court cannot conclude whether, when these Plaintiffs' *entire* purchasing

2    experiences are considered, their individual experiences purchasing products on the website

3    provided them with sufficient notice of the Terms of Service. *See Oberstein*, 60 F.4th at 516.

4    Under Section 4 of the FAA, then, this case must proceed "summarily to trial" on this issue.

5         Paula's Choice contemplated these circumstances in its Reply, asserting that, "Should the

6    Court nevertheless determine that individualized issues surrounding how each Plaintiff

7    experienced the Website and proceeded through the purchase flow . . . must be further

8    investigated to establish assent to the Terms of Use, it should hold the Motion in abeyance,

9    pending supplemental briefing with additional evidence." Dkt. No. 61 at 20. The Court construes

10   Paula's Choice's assertion as a request for limited discovery. *See Knapke v. PeopleConnect, Inc.*,

11   38 F.4th 824, 833 (9th Cir. 2022). For their part, Plaintiffs misstated the law when they acceded

12   that such a "factual dispute" might very well exist on this issue, but that if it did, its existence

13   would be "fatal" to Paula's Choice's motion. Dkt. No. 57 at 6. As both *Hansen*, its progeny, and

14   the FAA make clear, this dispute leaves the issue very much alive.

15        "[T]he FAA's procedure mirrors the three phases of federal civil lawsuits: a motion to

16   compel arbitration akin to a motion to dismiss; followed by optional discovery before summary

17   judgment, if the motion is denied; followed by a mini-trial, if necessary." *Knapke*, 38 F.4th at

18   833. Here, Paula's Choice has not demonstrated as a matter of law that it had an agreement to

19   arbitrate with five of the Plaintiffs at issue, so "the case moves to the next phase: discovery.

20   After discovery, the parties will brief—under the summary judgment standard—whether the

21   record establishes as a matter of law Plaintiffs entered into an arbitration agreement [with Paula's

22   Choice]. If there remains a genuine dispute, the case will proceed to trial on the issue of the

23   making of an arbitration agreement." *Noel v. Roblox Corp.*, No. C24-963, 2024 WL 3747454, at

24   *6 (N.D. Cal. Aug. 8, 2024).

Therefore, as to Plaintiffs Bartholomew-King, Bridges, Erriquez, van der Steeg, and Wright, the Court HOLDS IN ABEYANCE Defendant's Motion to Compel Arbitration and to Stay Litigation (Dkt. No. 48).

## IV.     CONCLUSION

Accordingly, it is hereby ORDERED:

(1)     Defendant Paula's Choice's Motion to Compel Arbitration and to Stay Litigation (Dkt. No. 48) is GRANTED IN PART and HELD IN ABEYANCE IN PART.

      a.     Plaintiffs Cohen, Froelich, and McCartan are ORDERED to pursue their claims in arbitration, as specified in their arbitration agreement, on an individual basis. Their claims against Defendant Paula's Choice are STAYED pending arbitration.

      b.     As to Plaintiffs Bartholomew-King, Bridges, Erriquez, van der Steeg, and Wright, the motion is HELD IN ABEYANCE.

(2)     The Parties SHALL: (a) meet and confer; (b) file a joint report identifying a proposed timeline for limited discovery pertaining only to whether Plaintiffs Bartholomew-King, Bridges, Erriquez, van der Steeg, and Wright consented to the arbitration agreement and providing each Party's position as to whether this issue should proceed as a bench or jury trial; and (c) file a proposed trial schedule.

The joint report and proposed trial schedule SHALL be filed **no later than fourteen (14) days** after issuance of this Order.

(3)    With the exception of the issue to be tried, all pending motions and other dates in this case are STAYED until the question regarding whether the Parties have agreed to arbitrate has been resolved.

Dated this 30th day of January 2025.

Tana Lin
United States District Judge